UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NO. 19-119 |
| BROCK MELANCON | SECTION M (3) |

### ORDER & REASONS

Before the Court is a motion to suppress filed by the defendant Brock Melancon seeking to exclude any evidence seized from his residence, a trailer, on April 23, 2019.[1] The government opposes the motion.[2] On October 17, 2019, the Court held an evidentiary hearing.[3] At the hearing, the government presented the testimony of Detective Deputy Dillon Michael Condetti, who was directly involved in the initial search of the defendant's residence and the defendant's arrest, who obtained the search warrant for the residence, and who was directly involved in the search of the residence pursuant to the search warrant. The government also presented photographs of the residence, taken during the search pursuant to the search warrant, the police report, and the search warrant itself.[4] Having considered the parties' memoranda, the testimony and other evidence elicited at the hearing, and the applicable law, the Court issues this Order & Reasons.

I. **BACKGROUND**

On April 23, 2019, at approximately 3:19 a.m., Terrebonne Parish Sheriff's Office Deputies Dillon Condetti and Tyler Fitch observed a vehicle in the parking lot of a Dollar

---

[1] R. Docs. 45; 45-1.
[2] R. Doc. 52.
[3] R. Doc. 53.
[4] R. Doc. 54.

General on Grand Caillou Road in Houma, Louisiana, which store was closed for the night.[5] The occupant of the vehicle, Trinity Bergeron, informed the deputies that he was waiting to pick up his children and their mother, Casey Robichaux, whom he called his wife, because she had been in an altercation with the person with whom she was staying. Bergeron consented to a search of the vehicle, during which the deputies located marijuana and prescription medication inside the vehicle. After the deputies advised Bergeron of his *Miranda* rights, Deputy Alexander Allen arrived on the scene. While continuing to speak to Bergeron, Deputy Condetti heard a female screaming, at which time Bergeron informed Deputy Condetti that Robichaux was located on Mozart Drive nearby.

At approximately 4:01 a.m., the deputies patrolled Mozart Drive and observed two female subjects with large bags and two small children. The deputies positively identified one of the women as Robichaux, who advised them that she had been in an altercation with the man with whom she was staying. The other woman, who remained unidentified, explained that she had just met Robichaux and was helping her leave the residence because it was chaotic. Robichaux and the other woman began loading the bags into Bergeron's vehicle and handed the children over to him, at which point Robichaux stated that she needed to return to the residence to retrieve the car seats for the children. The deputies followed Robichaux to 324 Mozart Drive, to ensure the car seats were handed off safely and to investigate the recent altercation. At the time, Robichaux had not provided the deputies with the identity of the man involved in the altercation or whether there were other witnesses or persons located at the residence.

Upon arrival at 324 Mozart Drive, a single-wide trailer with a small porch,[6] at approximately 4:04 a.m., Deputy Condetti observed a male subject handing Robichaux car seats. Deputy Condetti identified himself, after which the subject immediately closed the door of the

---

[5] Unless indicated otherwise, the facts provided are based on Deputy Condetti's police report, R. Doc. 45-2 at 9-12, together with Deputy Condetti's testimony at the hearing.

[6] *Id.* at 19.

2

residence behind him. Deputy Condetti asked him for an ID, which the man, identified as Wesley Hempel, gave. Deputy Condetti asked Hempel, who was visibly shaking, what had occurred that evening, to which Hempel responded that Robichaux had been in an "argument with [his] friend."[7] Right after this, another male subject opened the door and walked onto the small porch. Deputy Condetti identified himself and asked the second man for his ID, which the man, later identified as defendant Brock Melancon, said he needed to retrieve from inside the trailer. Melancon entered the residence and permitted Deputy Condetti to follow him. Deputy Condetti remained at the threshold of the trailer to watch Melancon and ensure he was not arming himself or attempting to flee. Meanwhile, Deputy Fitch was on the steps of the trailer's porch with Hempel, and Robichaux returned to Bergeron's vehicle, where Deputy Allen, Bergeron, the unidentified female, and children remained.

Melancon handed Deputy Condetti his ID and exited the residence to stand on the porch, while Deputy Condetti remained in the threshold of the trailer, with his back to the inside of the residence. After Deputy Allen advised that he needed to speak with Melancon, Bergeron approached Melancon and the two began yelling at each other. Deputy Fitch remained on the steps between the two men in order to keep them separated. Bergeron was asked to step away but would not do so. At this point, unable to step onto the crowded porch from the threshold of the residence, sensing the heightened tension from the ongoing verbal altercation, feeling increasingly outnumbered, and aware of recent shootings in the area, for which the perpetrator(s) had not been identified, Deputy Condetti began to fear for his safety and asked Melancon if there was anyone else located inside the trailer. Melancon answered in the negative and aggressively took a step toward the door and Deputy Condetti. Deputy Condetti then told Melancon to back up as he was going to conduct a security sweep for officer safety.

During the security sweep of the residence, Deputy Condetti entered each room,

---

[7] *Id.* at 11.

3

including the master bathroom where he opened the shower door to ensure no one was inside, and turning to go, observed a small bag of marijuana floating in the toilet in plain view. After completing the sweep, but continuing to secure the scene, he stepped outside the trailer onto the porch and conducted a pat-down of both Melancon and Hempel to search for weapons. Deputy Condetti observed Melancon place keys on the porch, which led Deputy Condetti to believe Melancon was distancing himself from them. While patting down Melancon, Deputy Condetti found $522 in his front pocket and observed Hempel place a cigarette pack on the porch. Hempel stated that the pack did not belong to him and that he had found it in the yard of the residence. Deputy Condetti looked inside the pack and found what appeared to be heroin. Both Melancon and Hempel were detained and informed of their *Miranda* rights; both stated they understood their rights and told Deputy Condetti that he needed a search warrant for the residence. Deputy Condetti contacted his supervisor Colonel Terry Daigre, who told him to contact Lieutenant Henry Dihn in order to obtain a search warrant. Deputy Condetti then approached Robichaux and told her to walk back to the residence for further investigation.

While waiting for Lieutenant Dihn, Deputy Condetti informed Robichaux of her *Miranda* rights, which she stated she understood. Robichaux told Deputies Condetti and Allen that she had been staying with Melancon for a few weeks, that she was fearful of Melancon, who had several firearms inside the residence, that she knew he was a narcotics dealer, and that narcotics were located inside the trailer as well.

Deputy Condetti applied for the search warrant, providing three reasons for probable cause that illegal items would be found inside the residence: (1) the marijuana found during the security sweep; (2) the suspected heroin found inside the cigarette pack; and (3) Robichaux's post-*Miranda* statements regarding illegal narcotics and weapons inside the residence.[8] Upon conducting a thorough search of the trailer pursuant to the search warrant, several firearms,

---

[8] *Id.* at 19-22.

illegal narcotics, and drug paraphernalia were found by law enforcement inside the residence.[9] According to Deputy Condetti, the majority of the narcotics were found inside a locked case, which the officers unlocked with the keys Melancon had placed on the porch. Thereafter, the grand jury charged Melancon and Hempel in a four-count indictment.[10] Melancon was charged with (1) conspiring to distribute methamphetamine and heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(C), and 846; (2) being a convicted felon in possession of a firearm, in violation of 28 U.S.C. §§ 922(g)(1) and 924(a)(2); (3) possessing with intent to distribute methamphetamine and heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(C), and 18 U.S.C. § 2; and (4) possessing firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).[11]

## II. PENDING MOTION

Melancon argues that Deputy Condetti violated his Fourth Amendment rights when he entered and searched his home without a warrant, and that the subsequent search pursuant to the search warrant also violated his Fourth Amendment rights because the warrant was based on facts learned during the first warrantless search.[12] He argues that the requirements for an exigency permitting a warrantless search, namely the requirements for a "protective sweep," are not met.[13] Furthermore, he argues that none of the "safety-valve doctrines" – independent source, inevitable discovery, or attenuation – is present, as would allow the second and third bases for the search warrant (*viz.*, the heroin and Robichaux's statements) to be considered untainted by the illegality.[14] Therefore, he argues, "all evidence obtained pursuant to both searches must be suppressed as the fruits of the constitutional violation."[15]

---

[9] *Id.* at 13-17.
[10] R. Doc. 1.
[11] *Id.*
[12] R. Doc. 45-1 at 1.
[13] *Id.* at 5-6.
[14] *Id.* at 6-7.
[15] *Id.* at 1, 7.

5

In response, the government argues that Deputy Condetti's initial search of the residence does meet the requirements of the protective sweep doctrine.[16] Even if the sweep was not constitutionally valid, the government argues that the heroin found in the cigarette pack together with Robichaux's statements are independent support for the search warrant with "more than enough probable cause."[17] Accordingly, it maintains that under both the protective sweep doctrine and independent source exception to the exclusionary rule, the evidence should not be suppressed.[18]

## III. LAW & ANALYSIS

### A. Protective Sweep

While normally a defendant bears the burden of proving by a preponderance of the evidence that a challenged search was unconstitutional, "where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005). Warrantless searches are presumptively unreasonable under the Fourth and Fourteenth Amendments but may be justified when "exigent circumstances exist to justify the intrusion." *United States v. Menchaca-Castruita*, 587 F.3d 283, 289 (5th Cir. 2009) (citation omitted). "As a general rule, exigent circumstances exist when there is a genuine risk that officers or innocent bystanders will be endangered, that suspects will escape, or that evidence will be destroyed if entry is delayed until a warrant can be obtained." *Id.* Under the protective sweep doctrine, government agents may conduct "a quick and limited search of premises for the safety of the agents and others present at the scene" without a warrant. *United States v. Mendez*, 431 F.3d 420, 428 (5th Cir. 2005). A sweep is constitutional if:

> (1) the government agents have a legitimate law enforcement purpose for being in the house; (2) the sweep is supported by a reasonable, articulable suspicion that

---

[16] R. Doc. 52 at 5-9.
[17] *Id.* at 9-11.
[18] *Id.* at 4-5.

6

> the area to be swept harbors an individual posing a danger to those on the scene; (3) the sweep is no more than a cursory inspection of those spaces where a person may be found; and (4) the sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and lasts no longer than the police are justified in remaining on the premises.

*Id.* (citations and quotations omitted). To justify the sweep, there must exist "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the … scene." *United States v. Silva*, 865 F.3d 238, 241 (5th Cir. 2017) (quoting *Maryland v. Buie*, 494 U.S. 324, 334 (1990)). In making this determination, the court considers the "totality of the circumstances surrounding the officers' actions." *Id.*

Deputy Condetti entered 324 Mozart Drive while investigating a domestic altercation. Bergeron, Robichaux, the unidentified female, and Hempel all had stated that an altercation had occurred at the residence between Robichaux and the man with whom she was staying – later identified as defendant Melancon – which had caused Robichaux to leave the residence with her children. The unidentified female had told the deputies that the situation had been chaotic. As the government explains, "[o]fficers responding to reports of [domestic] disputes often make it their first priority 'to secure the scene and create a safe environment in which to investigate the report.'" *United States v. Lewis*, 381 F. App'x 376, 381 (5th Cir. 2010) (quoting *United States v. Rodriguez*, 601 F.3d 402, 408 (5th Cir. 2010)).[19] In addition, the officers were aware this was a high-crime area where recent shootings with no police-identified suspects had taken place. When Deputy Condetti approached the residence and asked Melancon for his ID, Melancon permitted him to enter the trailer while Melancon searched for the ID, and Deputy Condetti did not enter more than necessary to watch Melancon retrieve the ID. When Melancon exited the trailer, Deputy Condetti was unable to leave the threshold because Melancon and Hempel were on the small porch, Deputy Fitch was on the steps, and Bergeron was in a heated argument with

---

[19] R. Doc. 52 at 6.

7

Melancon on the other side of Deputy Fitch. Deputy Condetti's fear for the safety of himself and others was reasonable. Given the circumstances, Deputy Condetti had a legitimate law enforcement purpose for being in the area to be swept.

The defendant argues that there was "no evidence that anyone else was inside the residence,"[20] but actual evidence existing at the time is not necessary to justify the protective sweep. Deputy Condetti needed only to have had a reasonable suspicion that someone else who could pose a danger could be inside the trailer. The escalating argument between Melancon and Bergeron, the multiple allegations that Melancon had been in an altercation with Robichaux, Hempel's suspicious behavior, the number of persons who had already emerged from the trailer, and the location of the trailer in a high-crime area with recent shootings support Deputy Condetti's reasonable suspicion that the residence could harbor an individual posing a danger to those on the scene, especially because he was unaware of how many individuals were or could be in the home. Robichaux had not informed the officers how many persons were inside the trailer, nor had the officers had time to ask her about this in the few minutes between when they first encountered her and when she darted off to retrieve the car seats. She had only stated that she had been in an altercation with the man with whom she was staying. At the point when Deputy Condetti decided he needed to conduct a sweep for safety, he had seen both Hempel and Melancon emerge from the trailer, knew that Robichaux, the unidentified woman, and the two children had left the residence recently, and was aware that Bergeron was somehow involved. In *United States v. Rodriguez*, officers responding to a 911 domestic disturbance call encountered children at the residence in question, though the caller had only informed the 911 operator about the defendant's presence. As a result, the officers "might have had a reasonable concern that just as [the caller] omitted mention of the children in the trailer, she also may have failed to disclose the presence of others." 601 F.3d at 406. Although Deputy Condetti had previously entered the

---

[20] R. Doc. 45-1 at 5-6.

8

threshold of the home, his focus then was ensuring that Melancon did not arm himself or flee the scene, not the possibility of others inside the residence. As the situation developed, it was reasonable for him to believe that, at approximately four in the morning, others might be inside, possibly sleeping, who could pose a danger both to his own life and the lives of the others at the scene. Furthermore, given the small size of the trailer and the circumstances, which were similar to those in *Silva*, it was reasonable for Deputy Condetti "to be concerned about other people who may be affiliated with the Defendant who would want to help him and that might still be in the trailer," when, "someone else …could have stuck a gun out the window and shot at the officers." 865 F.3d at 242 (quotations and citations omitted). A domestic altercation had recently occurred, and an argument between the two men who had been romantically involved with Robichaux was escalating outside; as a trained law enforcement officer, Deputy Condetti was aware that "domestic disputes often involve high emotions and can quickly escalate to violence." *Rodriguez*, 601 F.3d at 408.

Deputy Condetti's security sweep was cursory and brief. The defendant argues that the sweep was "invasive enough to discover contraband inside a toilet bowl."[21] But the officer had entered the trailer's close-quarters master bathroom to check if there was someone behind the opaque shower door, and only when closing the door and turning to leave did he observe the marijuana in the toilet bowl in plain view. The evidence demonstrates he was checking only for other persons in the trailer. The government points out that the "cursory nature of this search is evident by the fact that he did not find the numerous bags of heroin, methamphetamine, and pills, or the firearms later discovered during the warrant search."[22] The Court agrees.

Finally, the sweep lasted just a few minutes, no longer than necessary. Deputy Condetti exited the residence as soon as he was done searching the areas of the trailer in which a person

---

[21] R. Doc. 45-1 at 6.
[22] R. Doc. 52 at 8.

could be hiding.

Having examined the totality of the circumstances against the law's requirements for a protective sweep, the Court concludes that Deputy Condetti acted as a reasonably prudent officer and that exigent circumstances justified the protective sweep of the defendant's residence.

**B. Independent Source and Attenuation**

Even if the protective sweep had not been constitutionally valid, the suspected heroin found in the cigarette pack and Robichaux's statements are independent sources, sufficiently attenuated from the sweep, for probable cause supporting the warrant. "The independent source doctrine is based 'upon the policy that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied' had the misconduct occurred." *United States v. Restrepo*, 966 F.2d 964, 969 (5th Cir. 1992) (quoting *Murray v. United States*, 487 U.S. 533, 542 (1988)). "Thus, even if police engage in unconstitutional activities," such as an illegal entry and search of a home, "evidence discovered during such illegal activities is nonetheless admissible if it is also discovered through an independent source." *Id.* (citations omitted). In order to qualify for the "independent source" exception to the exclusionary rule,

> the government must make two showings in order for a lawful search pursuant to a warrant to be deemed genuinely independent of a prior illegal search: (1) that the police would still have sought a warrant in the absence of the illegal search; and (2) that the warrant would still have been issued (i.e., that there would still have been probable cause to support the warrant) if the supporting affidavit had not contained information stemming from the illegal search.

*United States v. Runyan*, 290 F.3d 223, 235 (5th Cir. 2002) (quotations and citations omitted).

First, as the government explains, it is "standard police practice to seek a search warrant"[23] upon encountering evidence such as the suspected heroin in the cigarette pack on the front porch of the residence and the statements by Robichaux. Robichaux stated that she had

---

[23] R. Doc. 52 at 10.

been living in the residence (and the officers had just witnessed her retrieve personal items from the residence), that Melancon was a narcotics dealer, and that firearms and illegal narcotics were inside the home. Second, there would have been sufficient probable cause to support the search warrant, had the affidavit only included these two bases and not mentioned the marijuana found in the toilet bowl. The statements plus the heroin "provided sufficient information linking [Melancon] with suspected narcotics trafficking to constitute probable cause for issuance of a search warrant," even without the information regarding the toilet bowl marijuana. *See Restrepo*, 966 F.2d at 971.

The defendant does not argue otherwise. Rather, he claims that this evidence cannot serve as independent sources of probable cause because "they too were the product of Deputy's Condetti's illegal conduct."[24] He argues that these bases are also "fruit[s] of the poisonous tree" and must be excluded under *Wong Sun v. United States*, 371 U.S. 471, 503 (1963), along with all the evidence found during the search conducted pursuant to the search warrant, because there "is a direct causal link between the initial illegal search and the subsequent search with a warrant" as "Robichaux's statements were made and the heroin was found after the 'security sweep' of the residence."[25] But a "direct causal link" does not exist merely because evidence is obtained temporally after an allegedly unconstitutional search.

"Under the fruit of the poisonous tree doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed," unless there is a "break in the [causal] chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation." *United States v. Cantu*, 230 F.3d 148, 157 (5th Cir. 2000) (quoting *United States v. Miller*, 146 F.3d 274, 279 (5th Cir. 1998) (citing *Brown v. Illinois*, 422 U.S. 590, 597-603 (1975))). The heroin in the cigarette pack was simply not "derived" from the protective sweep;

---

[24] R. Doc. 45-1 at 7.
[25] *Id*. at 6-7.

thus, there is no "causal chain" as to this evidence. Deputy Condetti observed Hempel place the cigarette pack on the porch during a pat down of Melancon. The pat down had been the next logical security step after the sweep, regardless of the discovery of the marijuana: having secured the trailer, Deputy Condetti was ensuring that the subjects did not pose a threat to either the officers or others at the scene. *See, e.g., United States v. Lucas*, 2013 WL 149664, at *3 (N.D. Ga. Jan. 14, 2013) ("[T]he defendant was frisked after the other officers completed the protective sweep of the house …; the frisk occurred as soon as the premises were secure."). There is no evidence that Deputy Condetti would not have conducted the pat down or otherwise found the heroin in the cigarette pack (which Hempel had discarded and disowned), but for conducting the protective sweep and finding the marijuana in the toilet bowl.[26]

As for Robichaux's statements, the Court must determine whether they were "sufficiently [acts] of free will to purge the primary taint" of the unconstitutional search, if the sweep was unconstitutional. *Brown*, 422 U.S at 602. The attenuation doctrine "'evaluates the causal link between the government's unlawful act and the discovery of evidence,'" by asking "whether the evidence 'has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *United States v. Mendez*, 885 F.3d 899, 909 (5th Cir. 2018) (quoting *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016), and *Brown*, 422 U.S. at 599)). The Supreme Court has laid out three factors under this doctrine to determine "whether the fruit of an unconstitutional violation should be suppressed." *Cantu*, 230 F.3d at 158 (citing *Brown*, 422 U.S. at 603-04). When the question involves whether "challenged custodial[27] statements are the 'fruit'" of a violation, a fourth factor is added, so that the Court must examine:

---

[26] Even if the sweep did lead to the pat down, Hempel's actions broke the "causal chain." In other words, under the attenuation doctrine discussed below, the heroin was sufficiently attenuated from the sweep because, while the pat down of Melancon occurred immediately after the sweep, Hempel's discarding and disowning of the cigarette pack was an intervening circumstance that justified recovery of the heroin from the pack. *See Brown*, 422 U.S. at 602-04.

[27] Because the attenuation factors are satisfied under the circumstances of this case, it is unnecessary to determine whether Robichaux was, in fact, in "custody" at the time she made the statements. At the outset, the Court notes that the voluntariness of the statements is unchallenged.

"(1) the provision of *Miranda* warnings; (2) the temporal proximity between the unlawful [search] and the challenged statements; (3) intervening circumstances; and (4) the purpose and flagrancy of the official misconduct." *Mendez*, 885 F.3d at 909 (citing *Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (quoting *Brown*, 422 U.S. at 603-04)); *see also United States v. Brandwein*, 796 F.3d 980, 985 (8th Cir. 2015) ("Observance of the *Miranda* rule is also relevant where applicable.").

First, Robichaux received *Miranda* warnings, which she stated she understood, before making the statements. This factor, then, favors the government. Second, the challenged statements were made soon after the initial search of the trailer. As in *Mendez*, only this factor can be said to favor the defendant, though even then, there is no evidence that the conditions in which Robichaux made her statements were severe. *See Mendez*, 885 F.3d at 911 ("[W]here relatively little time has elapsed, the determination generally turns on the conditions of custody."). Third, between the initial search and her statements, the officers found the suspected heroin in the cigarette pack. This is an intervening circumstance which breaks the causal chain of events, as the officers would validly have questioned Robichaux after finding the heroin, even had they not found the marijuana during the sweep, and so this factor favors the government. *See id.* at 912 (determining that the government's discovery of other illicit evidence after the illegal arrest was an intervening circumstance). Finally, the purpose and flagrancy of the initial search also favors the government. The Supreme Court has emphasized that this factor is particularly important. *Id.* at 909. This is because "[s]uppression of inculpatory evidence is an extraordinary remedy … [so] [t]his factor ensures that it is applied only where it serves its purpose of deterring police misconduct." *Id.* at 912 (citing *Hudson v. Michigan*, 547 U.S. 586, 591 (2006), and *Strieff*, 136 S. Ct. at 2063). As explained above, the purpose of the initial search was to secure the area for the safety of those at the scene – unquestionably a legitimate law enforcement purpose. The Court doubts whether the protective sweep was unconstitutional at

all, but even if it was, it certainly does not "rise to a purposeful or flagrant violation of [Melancon's] Fourth Amendment rights." *Strieff*, 136 S. Ct. at 2063.

As the search warrant is independently supported by probable cause based on the cigarette-pack heroin and Robichaux's statements, both sufficiently attenuated from the initial sweep, it is valid on this additional ground. Therefore, the evidence found in the search pursuant to the warrant should not be suppressed.

## IV. CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that the defendant's motion to suppress evidence (R. Doc. 45) is DENIED.

New Orleans, Louisiana, this 28th day of October, 2019.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE